UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK GILBERT,<br>       Plaintiff,<br><br>       v.<br><br>THE CITY OF CHICOPEE,<br>WILLIAM JEBB, JOHN<br>PRONOVOST, RICHARD J.<br>KOS, et al.<br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)   C.A. No. 3:16-cv-30024-MAP<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTIONS TO DISMISS
(Dkt. Nos. 73, 75, and 77)

November 14, 2017

PONSOR, U.S.D.J.

## I.   INTRODUCTION

Plaintiff Mark Gilbert, a police officer in the City of Chicopee, has brought this eight-count complaint against the City of Chicopee, Police Chief William Jebb, Mayor Richard J. Kos, and fellow Police Officer John Pronovost.[1]  All Defendants have moved to dismiss.  For the reasons set forth

---

[1] Defendants Jane and John Doe are also named in the caption of Plaintiff's complaint, but they are not mentioned in its body.  The claims against them will therefore be dismissed.

below, Defendants' motions to dismiss Counts 1 and 2, as well as the motion to dismiss all claims against Defendant Kos, will be allowed with prejudice.  These rulings will dispose of the complaint's federal claims.  The motions to dismiss the state law claims against the two remaining individual Defendants, Jebb and Pronovost, will also be allowed, but without prejudice to their refiling in state court, if Plaintiff wishes.

## II.  BACKGROUND

At the motion to dismiss stage, Plaintiff's well-pleaded facts must be taken as true, with all reasonable inferences drawn in his favor.  Shay v. Walters, 702 F.3d 76, 78 (1st Cir. 2012).  The facts are drawn from Plaintiff's Amended Complaint and supporting exhibits. (Dkt. No. 72.)

Weighing the motions to dismiss in light of the facts as set forth in the complaint has not been an easy task. The complaint wavers back and forth chronologically and sometimes offers disconnected narratives, with links between the factual allegations and Plaintiff's supposed injuries often difficult to discern.  The court previously struck one

version of the amended complaint based on its appalling
number of typos, grammatical lapses, and obscurities.  (Dkt.
No. 71.)  The current document has been cleaned up to some
extent, but it remains very difficult to follow.  The
summary below is the court's best effort to give the
complaint's factual narrative some coherence.

Over at least the past decade, Plaintiff has been a
police officer for the City of Chicopee.  Defendants Jebb
and Pronovost were fellow officers during this time.  In
2007, Defendant Pronovost fell into a depression after his
wife died, and he began behaving strangely at work.  At some
point, Plaintiff complained about this behavior to Defendant
Jebb, who was at the time Captain of his shift.  Nothing was
done in response to Plaintiff's complaint.  Thereafter, on
an unspecified date in December, Plaintiff and Pronovost got
into an argument about Pronovost's behavior.  During the
interchange, Pronovost allegedly pulled out his gun and
pointed it at Plaintiff.  Plaintiff verbally reported the
incident to his commanding officer Thomas Charette.[2]  Again,

---

[2] Plaintiff alleges that Defendant Jebb was in the room
with Plaintiff and Pronovost during this incident. However,
Defendant Jebb disputes Plaintiff's version, stating that

nothing was done.

In 2012, Plaintiff was promoted to the rank of Captain, and Charette was appointed Acting Police Chief.  Defendant Jebb, also a candidate for Acting Police Chief, allegedly resented Charette and other police officers, including Plaintiff, who he believed had supported Charette's appointment.

That same year, certain Chicopee Police Officers responding to a murder scene took pictures of the victim's body and shared them with one another and with civilians outside the police department in violation of department regulations.  At the time, Defendant Jebb was the Internal Affairs Investigative Officer tasked with investigating this incident.  Jebb concluded that only one officer was responsible for the improper conduct, and he failed to recommend, in Plaintiff's view, a sufficiently stringent sanction.

At some point in the 2012-2013 time frame, the investigation into the murder scene misconduct by Chicopee

──────────────────

the event in question "never happened."  (Dkt. No. 67-5 at 15.)

4

Police Officers resumed.  This time the inquiry included an
incident where photographs of the murder victim's corpse
were allegedly displayed to civilians outside the police
department at a football game.

In May 2013, Jebb was relieved of his duties with
Internal Affairs, and he himself became a target of an
investigation into his conduct as the Internal Affairs
Investigative Officer.  This second investigation focused,
in part, on allegations that Jebb failed to look into sexual
harassment charges against several officers.  It also looked
into whether Jebb had properly investigated the officers who
had distributed the gruesome photographs from the murder
scene.

Jebb had made an unsuccessful bid for the office of
President of the Police Union in 2013, and the complaint
refers to an allegation that he improperly numbered the
ballots in that election in order to be able to identify
which officers supported him and which supported his
opponent, Sgt. Dan Major.  Finally, Defendant Jebb was also
accused of hiding evidence to thwart an internal
investigation into allegations that Sgt. Major had choked a

prisoner.[3]  Plaintiff Gilbert had been the investigating
officer for the Major investigation, and he had recommended
no discipline be taken against Sgt. Major.

If the above summary comes across as a meandering tale
of a sadly overwrought and contentious workplace, then it
has accurately presented the tenor of the complaint.
Plaintiff characterizes his participation in the ongoing
investigations to include "provid[ing] information and
participat[ing] in activity which focused on Police Chief
William Jebb's conduct and practices of implementing less
than proper discipline towards his friends and retaliating
against those he was not friends with; and those who did not
vote for him to be the Union President."  (Dkt. No. 67-2 at

---

[3] Plaintiff's complaint implies that these charges
formed part of the investigation(s) then pending against
Jebb and not merely allegations on Plaintiff's part offered
in this litigation. (Dkt. No. 72 at 3-4.)  Although the
complaint is ambiguous on this point, Defendants Jebb and
Kos's Memoranda in support of their Motions to Dismiss
clarify the context to some extent.  Jebb's Memorandum notes
that Plaintiff made "written statements and testimony ... to
a government investigator relating to Jebb's alleged
mishandling of ballots". (Dkt. No. 28 at 1.)  Kos's
Memorandum observes that Plaintiff, "as a police captain and
internal affairs investigator had investigated Chief Jebb's
removal of evidence from the booking room."  (Dkt. No. 23 at
11.)

1.)

In July 2013, then-Acting Police Chief Charette asked
Plaintiff to draft and file a written incident report about
the episode six years earlier when Defendant Pronovost had
threatened Plaintiff with his gun.  Plaintiff did so.  The
report was technically late, in violation of Department
policy, but Charette did not discipline Plaintiff, as
Plaintiff had verbally reported the incident to Charette and
another of his immediate supervisors at the time it
occurred.

According to Plaintiff, Defendant Jebb was unhappy with
Plaintiff's participation in the ongoing investigation of
the gun incident and possibly other incidents.  On October
15, 2013, Plaintiff received a phone call from Defendant
Jebb in which the latter told him, "You have no idea about
internal affairs, but you are going to learn.  I am
definitely without a doubt going to win my appeal [regarding
his having been passed over for Acting Chief] and when I do,
your [sic] fucked."  (Dkt. No. 67-3 at 1.)

In 2014, Defendant Mayor Kos appointed Defendant Jebb
as Police Chief.  Plaintiff alleges that thereafter Jebb

"began changing [Plaintiff's] terms and conditions of
employment and engaged in a concerted effort to have
criminal charges initiated against [Plaintiff]."  (Dkt. No.
72 at 9.)  Plaintiff claims Defendant Jebb ordered him off
all of his overtime details, citing as a reason Plaintiff's
filing of a false police report in regard to the 2007 gun
incident.  Plaintiff claims that Defendant Jebb repeatedly
"initiat[ed] pretextual discipline" against him, but he does
not provide details or state when this occurred.  In any
event, the complaint specifies no disciplinary sanctions
resulting from these proceedings.

Around this time, according to the complaint, Defendant
Jebb met with Defendants Kos and Pronovost as part of a
conspiracy to bring retaliatory criminal charges against
Plaintiff and Charette.  Charges were eventually brought
against Plaintiff in Holyoke District Court, perhaps for
filing a False Police Report.  It is difficult to tell from
the complaint, which does not provide a date these charges
were brought, what exactly those charges were, or how the
criminal case resolved.  Count 4 in the complaint states
that Plaintiff was charged with Filing a False Police

Report, which presumably is the criminal case Plaintiff is referring to.  Additionally, Plaintiff states that the "process terminated in [his] favor," (Dkt. No. 72 at 17.) though it is not clear if that means he was acquitted of the charge after a trial or the charge was dropped.

The show-cause hearing on March 16, 2015, regarding the application for the criminal complaint against Plaintiff, appears to have degenerated into a chaos of accusations and counter-accusations.  The Chicopee Police Department was described by several parties testifying that day as "fragmented," plagued by "mean spirited division," and divided into "factions."  (Dkt. No. 67-5 at 22, 36, and 51.) In his testimony, former Chief Charette characterized his relationship with Defendant Jebb as "[h]orrible."  (Id. at 34.)  Defendant Jebb during his own testimony said that "Charette and his gang all engaged in a character assassination" of him.  (Id. at 16 and 19.)  Jebb also testified that certain officers had "jeopardized their integrity, [had] made false statements, and [were] going to be held accountable for those statements."  (Id. at 17.) Defendant Jebb stated that Plaintiff Gilbert had mishandled

the investigation into Sgt. Major's choking episode, and that this was "one of the issues" that could require disciplinary action.  (Id. at 27.)

During the show-cause hearing it also came to light that Plaintiff was one of several officers "being sued individually and as part of the Chicopee Police Department" in a federal lawsuit.[4]  (Id. at 30.)  Defendant Jebb further testified that disciplinary proceedings would likely be initiated against Plaintiff Gilbert, but that, "[a]t the advice of the city, [he was] waiting patiently" for pending legal matters to resolve.  (Id. at 27.)  According to Plaintiff, disciplinary proceedings were initiated against him after the show-cause hearing.  Again, no specifics are offered as to what these were or what the outcome was.

On February 4, 2016, Plaintiff brought this complaint in eight counts:

Count 1: a claim under 42 U.S.C. § 1983 and Mass. Gen. Laws ch. 12, § 11H against the individual Defendants for

---

[4] Plaintiff, along with several other officers, was a named defendant in a federal lawsuit stemming from the incident with the prisoner.  The case, Maldonado v. Major, et al, 3:15-cv-30022-MAP, was settled on August 27, 2015.

retaliation against him for exercising his First Amendment rights to speak on a matter of public concern and for due process rights violations;

Count 2: a claim under 42 U.S.C. § 1983 against the City of Chicopee for maintaining policies and customs that resulted in the violation of Defendant's First Amendment rights;

Count 3: a claim under Mass. Gen. Laws ch. 149, § 185 (the Whistleblower Statute) against the City, Jebb, and Kos for taking retaliatory actions against Plaintiff;

Count 4: a common law claim for Abuse of Process against the individual Defendants;

Count 5: a common law claim for Defamation against the individual Defendants;

Count 6: a common law claim for Intentional Infliction of Emotional Distress against the individual Defendants;

Count 7: a common law claim for Malicious Prosecution against the individual Defendants; and

Count 8: a common law claims for Civil Conspiracy against the individual Defendants.

In response to Plaintiff's initial complaint,

11

Defendants filed motions to dismiss.  (Dkt. Nos. 73, 75, and
77.)  Plaintiff responded to these motions both with a
substantive opposition and with a motion to amend.   The
court allowed the motion to amend on March 7, 2017, and
denied the pending motions to dismiss, without prejudice to
refiling once the amended complaint arrived.  As noted
above, the court struck Plaintiff's first try at an amended
complaint based on its extreme sloppiness.  In response to
the new amended complaint (Dkt. No. 72.), Defendants City
and Kos, Jebb, and Pronovost have once more filed separate
motions to dismiss for failure to state a claim.  (Dkt. Nos.
73, 75, and 77.)

### III.  DISCUSSION

     In addressing a motion to dismiss, a court employs a
two-pronged approach.  Ocasio-Hernandez v. Fortuno-Burset,
640 F.3d 1, 12 (1st Cir. 2011).  The analysis begins by
identifying and disregarding portions of the complaint that
merely offer "[t]hreadbare recitals of the elements of a
cause of action" or "legal conclusion[s] couched as . . .
factual allegation[s]."  Ashcroft v. Iqbal, 556 U.S. 662,
678 (2009) (quoting Bell Atlantic Corp. v. Twombly et al,

550 U.S. 554, 555 (2007)).  A plaintiff is not entitled to
"proceed perforce" by virtue of allegations that merely
parrot the elements of the cause of action.
Ocasio-Hernandez, 640 F.3d at 12 (quoting Iqbal, 556 U.S. at
680).  Thereafter, non-conclusory factual allegations in the
complaint must be treated as true and weighed for
sufficiency.  If the complaint's substantive factual content
"allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged," the claim
has facial plausibility.  Iqbal, 556 U.S. at 679.  The
reviewing court may not disregard properly pled factual
allegations, "even if it strikes a savvy judge that actual
proof of those facts is improbable."  Twombly, 550 U.S. at
556.

        The customary analysis of the motions to dismiss here
has been handicapped, as noted, by the disjointed factual
allegations, but also by the complaint's broad conclusory
language.  For example, the complaint says that "Defendant
Pronovost's purpose [in pursuing charges against Plaintiff]
was not to redress any alleged criminal conduct, but to
retaliate against those who opposed Defendant Jebb."  (Dkt.

No. 72 at 11.)  Important details confusingly appear for the
first time only <u>after</u> the Statement of Facts.  For example,
a reference to an email sent by Defendant Jebb regarding one
"Lieutenant Watson" on September 12, 2014, appears out of
the blue in the text of Count 3.  (<u>Id</u>. at 16.)  Finally,
critical factual details, such as the timing and nature of
the supposed "pretextual discipline" are simply absent from
the complaint.

     The discussion below will begin with the constitutional
claim the complaint attempts to offer in Count 1 against all
the individual Defendants for alleged violations of
Plaintiff's First Amendment rights.  It will then proceed to
an analysis of the constitutional claim set forth in Count 2
against the City for a policy and custom that resulted in
the violation of Plaintiff's Fourth and Fourteenth Amendment
rights.  As will be seen, whatever else may lurk in the
complaint's text, it contains woefully insufficient support
for any cause of action under the United States
Constitution.  Given this, the court will allow Defendants'
motions to dismiss Counts 1 and 2 with prejudice.  Because
the allegations against Defendant Kos are so entirely

speculative and conclusory, in violation of the <u>Twombly</u> and

<u>Iqbal</u> standard, the court will dismiss the complaint against

this Defendant with prejudice as well.  The purely state law

claims against the two remaining individual Defendants, Jebb

and Pronovost, will be dismissed, as an exercise of the

court's discretion, without prejudice to their refiling in

state court, if Plaintiff wishes to pursue them.

### A. Count 1: First Amendment Claims Against the Individual Defendants

To make out a prima facie case of a First Amendment

violation, Plaintiff must show that "(1) [he] spoke on a

matter of public concern; (2) [his] interest in the speech

outweighed any countervailing governmental interest in

promoting the efficient performance of the service provided

by its employees; and (3) the protected speech was a

substantial or motivating factor in an adverse employment

decision."  <u>Kruger v. Cressy</u>, 201 F.3d 427 (1st Cir. 2000)

(table) (quoting <u>Wytrwal v. Saco School Bd.</u>, 70 F.3d 165,

170 (1st Cir.1995)).

Plaintiff's claim founders at the first prong.  Whether

an employee's speech addresses a matter of public concern

must be determined by the content, form, and context of the

statement in question, as determined by the record.   Connick
v. Myers, 461 U.S. 138, 147-48 (1983).   Speech made pursuant
to official duties is generally not protected speech.
Garcetti v. Ceballos, 547 U.S. 410 (2006).   As a rule, "when
a public employee speaks not as a citizen upon matters of
public concern, but instead as an employee upon matters only
of personal interest, absent the most unusual circumstances,
a federal court is not the appropriate forum in which to
review the wisdom of a personnel decision taken by a public
agency allegedly in reaction to the employee's behavior."
Connick, 461 U.S. at 147 (emphasis added).

　　　Further refining the test for protected speech by an
employee under the First Amendment, the Supreme Court has
held, "Truthful testimony under oath by a public employee
outside the scope of his ordinary job duties is speech as a
citizen for First Amendment purposes.   That is so even when
the testimony relates to his public employment or concerns
information learned during that employment."   Lane v.
Franks, 134 S. Ct. 2369, 2378 (2014) (emphasis added).
Presumably with an eye on Lane, Plaintiff contends that his
participation in the investigation initiated by the City of

Chicopee into Defendant Jebb's conduct as Investigative Officer "was not part of the Plaintiff's regular or routine duties as a Chicopee Police Officer." (Dkt. No. 72 at 7.)

As a preliminary matter, the analysis of Plaintiff's free speech claim is handicapped by a lack of specificity regarding exactly what "speech" the complaint is referring to.  This is not a case where Plaintiff wrote a letter or spoke out at a public meeting.  Exactly what Plaintiff said, and when, is left very vague.  No suggestion is made that he testified under oath pursuant to a subpoena as in <u>Lane</u>.

Even if the court could locate specific speech, the complaint makes clear that whatever expression occurred was offered in the context of Plaintiff's employment. Plaintiff's cooperation with the investigation into his coworkers' conduct was "ordinarily within the scope" of his job duties.  <u>Lane</u>, 134 S. Ct. at 2373.  Significantly, Plaintiff emphasizes, as to the report he authored, that he was "ordered to provide testimony and information with a government investigation." (Dkt. No. 72 at 15.)  Speech made in response to a command by a supervisor is manifestly not speech made in an individual's capacity as a private

17

citizen.   Decotiis v. Whittemore, 635 F.3d 22, 32 (1st Cir.

2011).

Decotiis lays out several "non-exclusive factors" that

may suggest a distinction between speech by a public

employee in a professional versus a private capacity.   These

include:

> whether the employee was commissioned or paid to make
> the speech in question, Garcetti, 547 U.S. at 421; the
> subject matter of the speech, Id. at 421 (citing Givhan
> v. W. Line Consol. Sch. Dist., 439 U.S. 410, 414
> (1979)); whether the speech was made up the chain of
> command, see Id. at 420; whether the employee spoke at
> her place of employment, see Brammer-Hoelter v. Twin
> Peaks Charter Acad., 492 F.3d 1192, 1205 (10th Cir.
> 2007); whether the speech gave objective observers the
> impression that the employee represented the employer
> when she spoke (lending it "official significance"),
> Foley v. Town of Randolph, 598 F.3d 1, 7-8 & n.9 (1st
> Cir. 2010); whether the employee's speech derived from
> special knowledge obtained during the course of her
> employment, see Williams v. Dallas Ind. Sch. Dist., 480
> F.3d 689, 694 (5th Cir. 2007); and whether there is a
> so-called citizen analogue to the speech, Garcetti, 547
> U.S. at 423.

Id. at 32.

The speech in question here (to the extent it can be

identified) derived from special knowledge obtained during

the course of employment, at Plaintiff's place of

employment, and was intended to go up the chain of command.

It was indisputably offered in Plaintiff's capacity as a

police officer and public employee, and not as a private
citizen. Given this, a cause of action for violation of the
First Amendment simply does not lie, and Count 1 must be
dismissed with prejudice.

B.    Count 2: the Constitutional Claim Against the City
      To state a claim for municipal liability under 42

U.S.C. § 1983, a plaintiff must offer sufficient facts to
permit the court to identify an unconstitutional custom or
policy of the city that was "the 'moving force' behind the
injury alleged."  Haley v. City of Boston, 657 F.3d 39, 51
(1st Cir. 2011) (quoting Bd. of Cnty. Comm'rs of Bryan City
v. Brown, 520 U.S. 397, 403-4 (1997) (internal quotation
omitted).

      To satisfy this standard, Plaintiff alleges in
conclusory terms that the City of Chicopee "[b]y its action,
inaction and deliberate indifference . . . knowingly,
willfully and intentionally allowed a policy and custom to
exist which resulted in violations of Plaintiff's rights
under the First Amendment" and under Massachusetts law, as
well as in his "due process rights of having a protected
property interest in his continued employment." (Dkt. No. 72
at 14.)

19

In connection with the municipal liability claim, Plaintiff also alleges that Defendant Mayor Kos, "as the final policy maker, participated and acquiesced to the policy and practices of Defendant City of Chicopee." (Dkt. No. 72 at 15.)  The allegation is offered despite the undisputed fact that Kos took office in January 2014, well after many of the events identified in the complaint took place.

While the complaint conveys Plaintiff's sense of grievance about general misconduct at his place of employment and the repercussions for him, exactly what municipal custom or policy this course of conduct expressed and how it caused any <u>constitutional</u> injury is left to speculation.  No particular pattern of behavior having impact beyond Plaintiff himself is alleged.  Given the failure to articulate a specific municipal custom or policy, or to offer concrete allegations demonstrating its existence, Defendant City's motion to dismiss Count 2 must be allowed.

C. <u>Defendants' Motions on Counts 3-8</u>

As a general rule, where a plaintiff's federal claims

are dismissed at an early stage of the litigation, the court should, as a matter of discretion, dismiss supplemental state-law claims without prejudice to their refiling in state court. Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)). Based on this rule, Plaintiff's claims under state law, with one exception, will be dismissed without prejudice.

The exception will be the claims against Defendant Kos. It is well established that a complaint must be dismissed if it tenders "naked assertion[s]" devoid of "further factual enhancement." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 577). As to Kos, the complaint relies entirely on conjecture and speculation and fails to marshal any facts that could support a viable cause of action against him. As noted, much of the complaint refers to events occurring before Kos became Chicopee's mayor. For this reason, the motion to dismiss the state law claims against this Defendant will be allowed, with prejudice.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motions to

21

dismiss (Dkt. Nos. 73, 75, and 77) are hereby ALLOWED as to all counts.  The dismissals as to Counts 1 and 2, and as to the claims against Defendant Kos, are WITH PREJUDICE. The dismissals as to Counts 3-8 against Defendants Jebb and Pronovost are WITHOUT PREJUDICE to their refiling in state court, if Plaintiff wishes.  This case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U.S. DISTRICT JUDGE